Betsy HELD, Trustee for the heirs-at-law and next of kin of Paul Robert Held, Jr.; Viola Patricia White, Trustee for the heirs-at-law and next of kin of John T. White, Chloe Held, Trustee for the heirs-at-law and next of kin of Paul Robert Held, Sr.; Chloe Held, Trustee for the heirs-at-law and next of kin of Charles O. Held; United Dressed Beef Company, Southeastern Aviation (Illinois) Corp.; and The Insurance Company for the State of Pennsylvania, Plaintiffs,

v.

MITSUBISHI AIRCRAFT INTERNATIONAL, INC., and Mitsubishi Heavy Industries, Ltd., Defendants.

Civ. No. 4–85–1148.

United States District Court,
D. Minnesota,
Fourth Division.

Aug. 14, 1987.

Steven Rau, Maun, Green, Hayes, Simon, Johanneson & Brehl, St. Paul, Minn., and David J. Adams and Diane I. Jennings, Lord, Bissel & Brock, Chicago, Ill., for The

Insurance Company for the State of Pa. and Southeastern Aviation (Illinois) Corp.

Charles T. Hvass, Jr., Hvass, Weisman & King, Chartered, Minneapolis, Minn., for Betsy Held and Viola White, trustees.

Winthrop A. Rockwell, Faegre & Benson, Minneapolis, Minn., for Chloe Held, trustee.

Eric L. Koch, John Lommen, and Craig D. Peterson, Mark N. Stageberg, Lommen, Nelson, Cole & Stageberg, P.A., Minneapolis, Minn., and Duncan A. Fraser and Marshall Turner, Condon & Forsyth, New York City, for defendants.

## MEMORANDUM AND ORDER

MacLAUGHLIN, District Judge.

This matter is before the Court on defendants' motions for summary judgment and on plaintiffs' motion for summary judgment, motion to preclude, motion for default judgment, and motion to strike defenses. Defendants' motions will be granted in part and denied in part. Plaintiffs' motions will be granted in part and denied in part.

### FACTS

This case arises from the December 6, 1980 crash of a 1979 Mitsubishi MU–2b–40 Aircraft International at Crystal Airport in Anoka County, Minnesota in which five persons were killed. Plaintiffs in this case are (1) United Dressed Beef Company, a Minnesota corporation with its principal place of business in Minnesota and the purchaser of the plane; (2) Southeastern Aviation (Illinois) Corporation, an Illinois corporation with its principal place of business in Illinois and insurer of the aircraft for United; (3) The Insurance Company For the State of Pennsylvania, a Pennsylvania corporation with its principal place of business in Pennsylvania, also United's insurer of the aircraft;[1] and (4) Betsy Held, Viola White and George McClintock, all Minnesota citizens as trustees on behalf of four of the deceased passengers.

The two[2] defendants in this case are (1) Mitsubishi Heavy Industries, Ltd., a Japanese corporation with its principal place of business in Japan and the designer and manufacturer of the plane (Heavy Industries); and (2) Mitsubishi Aircraft International, Inc., also a Texas corporation with its principal place of business in Texas which assembled the aircraft and sold it to United (Aircraft International). Jurisdiction of the Court is founded on the diversity provision of 28 U.S.C. § 1332.

Plaintiff United purchased the airplane in question for $912,000 from Aircraft International pursuant to a contract entitled Retail Purchase Order dated September 4, 1979. The contract lists Aircraft International as seller; in its definitional section it specifies that any reference to Mitsubishi or MAI means Aircraft International.[3] The name of Heavy Industries, the designer and manufacturer of the plane, nowhere appears on the document. The contract contains a number of warranty disclaimers and limitation of remedies provisions which are at the crux of the dispute before the Court. It also specifies that it should be interpreted and applied according to Texas law.

On December 6, 1980 the plane purchased by United crashed while making its final approach at Crystal Airport in Anoka, Minnesota, killing all five occupants aboard. The plane was completely destroyed in the crash. Plaintiffs commenced this action against Aircraft International and Heavy Industries on December 2, 1983. United on its own behalf and on behalf of

---

1. Southeastern is the managing general agent of the Insurance Co. The two insurance companies will collectively be referred to as the "insurers."

2. The United States, through the involvement of the Federal Aviation Administration (FAA) at Crystal Airport, was initially made a defendant to the case. The claims asserted against the United States were, however, later dismissed.

3. The contract provides:
 As used herein the following terms shall have the following meanings:
 (A) "Mitsubishi" or "MAI" shall mean Mitsubishi Aircraft International, Inc., San Angelo, Texas.
 . . . .
 Contract, par. 1.

its insurers,[4] seeks to recover $897,000 for the value of the aircraft, $3,000 for the deductible on United's insurance policy, $3,896.95 for costs incurred in removing the wreckage, and $130,000 paid in settlement of one of the passenger claims. The trustees on behalf of the four other victims are asserting wrongful death claims and seek an amount in excess of $50,000 for each victim.

Plaintiffs allege that the defendants were negligent in the design, construction and manufacture of the aircraft and its components, as well as in its overhaul, service and repair and that the negligence was the proximate cause of the crash. Amended Complaint, Count I, par. 11. In addition, plaintiffs seek to recover on theories of strict liability in tort, as well as for breach of express and implied warranties of fitness and safety. *See* Amended Complaint, Count VII, par. 11, 13.

Defendants request that the Court dismiss all claims asserted by United arising from the loss of the aircraft and settlement of third-party claims. Defendants argue that the nature of United's loss is purely economic, thereby barring claims in either strict liability or tort. In addition, they also argue that the disclaimer of warranties and limitation of remedies provisions in the contract preclude United from maintaining an action for breach of express or implied warranties or otherwise recovering under the contract. The Court holds that United cannot proceed under a theory of strict liability in tort against either defendant. The Court also holds that as against defendant Heavy Industries United may proceed under theories of breach of implied warranty of merchantability and negligence. As regards defendant Aircraft International the Court holds United may proceed under a theory of negligence as well as pursue its contractual remedies, as interpreted by the Court. The Court finds that as applied to the alleged design defect of the airplane, the time limitations of the repair and replace clause in the contract

are manifestly unreasonable and therefore unenforceable.

## DISCUSSION

### DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

#### I. Warranties

A defendant is not entitled to summary judgment unless the defendant can show that no genuine issue exists as to any material fact. Fed.R.Civ.P. 56(c). Summary judgment is an extreme remedy that should not be granted unless the moving party has established a right to judgment with such clarity as to leave no room for doubt and unless the nonmoving party is not entitled to recover under any discernible circumstances. *E.g., Vette Co. v. Aetna Casualty & Surety Co.,* 612 F.2d 1076, 1077 (8th Cir.1980). In considering a summary judgment motion, a court must view the facts most favorably to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *E.g., Hartford Accident & Indemnity Co. v. Stauffer Chemical Co.,* 741 F.2d 1142, 1144–45 (8th Cir.1984). The nonmoving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing that there is a genuine issue for trial. *Salinas v. School District of Kansas City,* 751 F.2d 288, 289 (8th Cir.1984).

#### A. Choice of Law

 Both parties agree that Texas law in general, and the Texas Uniform Commercial Code in particular, controls the contractual issues in this case due to the choice of law clause in the contract. A federal court sitting in diversity must apply the law of the state in which it sits, including the choice of law rules of that state. *Erie Railroad Co. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Klaxon Co. v. Stentor Electric Manuf. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed.

---

**4.** The insurers paid $897,000 to United pursuant to an insurance policy covering the plane and paid $130,000 to the trustee of one of the victims also pursuant to the policy. They are thus subrogated to United's rights in this action to the extent of their payments. Unless otherwise noted all references to United include its insurers.

1477 (1941). Because the dispute in the present case involves the sale of goods (*see* Minn.Stat. § 336.2–105), the rights and liabilities of the parties are governed to a great extent by the Uniform Commercial Code. Minnesota's Uniform Commercial Code choice of law section provides in relevant part:

> (1) ... [W]hen a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights and duties. Failing such agreement this chapter applies to transactions bearing an appropriate relation to this state.

Minn.Stat. § 336.1–105 (1986). Minnesota courts are committed to honoring agreements between parties as to choice of law. *Milliken and Co. v. Eagle Packaging Co.*, 295 N.W.2d 377, 380 n. 1 (Minn.1980); *Combined Insurance Co. of America v. Bode*, 247 Minn. 458, 77 N.W.2d 533, 536 (1956). The airplane in question was assembled and sold in Texas and thus it bears a reasonable relationship to that state. *See, e.g., Lafayette Stabilizer Repair, Inc. v. Machinery Wholesalers Corp.*, 750 F.2d 1290 (5th Cir.1985) (contractual provision to apply Florida law bore reasonable relationship to Florida where seller was located there). There is therefore no reason to question the parties' agreement that Texas law governs the contract. Of course, plaintiffs' tort claims do not arise from the contract; therefore, contractual choice of law provisions do not necessarily control. *See, e.g.,* L. Frummer & M. Friedman, 2 *Products Liability,* § 3.01[5] at 3–48 (1986) (noting warranty disclaimers are matter of contract law and thus are not necessarily controlling under the rule of strict liability in tort). Both parties, however, have noted that Minnesota law does not differ from Texas law as regards any of the issues in this case.[5] There is, therefore, no reason

not to apply Texas law since both parties are in agreement that it should apply even as to the tort claims.

**B. Nature of Loss**

The amenability of either defendant to claims based on strict liability in tort requires an examination of the type of losses alleged by plaintiffs. The distinction between pure economic loss, on the one hand, and property loss or personal injury on the other, governs the ability of a plaintiff to recover in strict liability. Economic loss is "merely loss of value resulting from a failure of the product to perform according to the contractual bargain." *Mid Continent Aircraft Corp. v. Curry Cty. Spraying Service, Inc.*, 572 S.W.2d 308, 311 (Tex. 1978).

Where a plaintiff seeks to recover damages for a defective product which has caused damage only to itself, the loss is deemed economic loss and cannot be recovered in strict liability; it can generally only be recovered in contract.[6] *Nobility Homes, Inc. v. Shivers*, 557 S.W.2d 77, 83 (Tex.1977); *Mid Continent*, 572 S.W.2d at 313; *Henderson v. Ford Motor Co.*, 547 S.W.2d 663, 667 (Tex.Civ.App.1977); *cf. East River Steamship Corp. v. Transamerica DeLaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 2305, 90 L.Ed.2d 865 (1986) (admiralty law). The rationale for this rule is that it reinforces the pre-eminence of the Uniform Commercial Code as a comprehensive system for allocating losses that arise from commercial transactions. *Mid Continent*, 572 S.W.2d at 312. In contrast, where the defective product causes damages not only to itself but also to other persons or property, the entire resultant damage is recoverable in strict liability. *Tokio Marine and Fire Insurance v. Bell Helicopter Textron*, 17 Av.Cas. (CCH) 17,321, 17,330 (S.D.Tex.1982) (applying Texas law) *citing Signal Oil & Gas Co. v. Uni-*

---

5. Texas does permit recovery of economic loss under theories of both implied warranty and negligence whereas Minnesota only permits recovery for economic loss under a theory of implied warranty. This difference is not, however, outcome determinative to the issues in this case. *See* discussion at 377–78, *infra.*

6. Texas has adopted the minority position that economic loss can be recovered under a theory of negligence as well as contract. *See* discussion at 377–78 *infra.*

versal *Oil Products,* 572 S.W.2d 320, 325 (Tex.1978). The rationale underlying this rule is that "[t]o the extent that the product itself has become part of the accident risk or the tort by causing collateral property damage, it is properly considered as part of the property damages, rather than as economic loss." *Signal Oil,* 572 S.W.2d at 325, *citing* Keeton, *Torts* in *Annual Survey of Texas Law,* 32 S.W.L.J. 1, 5 (1978).

### 1. Conversion of Economic Loss By Payment to Third Party

In addition to damages for the destruction of the plane United also seeks to recover a payment of $130,000 to the family of one of the crash victims. A preliminary issue is whether this payment converts otherwise pure economic loss (damage to the plane itself) into a property loss recoverable in tort. Defendants rely on *General Motors Corp. v. Simmons,* 558 S.W.2d 855 (Tex.1977), *overruled in part on other grounds, Duncan v. Cessna Aircraft Co.,* 665 S.W.2d 414, 427 (Tex.1984) as authority to the contrary. *Simmons* arose out of an accident between a truck and an automobile in which only the automobile driver was injured. The automobile driver sued both the truck driver and truck owner as well as the manufacturer of the automobile. The automobile driver then entered into a covenant not to sue and an indemnity agreement with the truck driver and owner whereby, in return for an unspecified payment, the automobile driver would pay the truck owner 50 percent of any recovery up to $400,000 obtained from the manufacturer. The truck driver and owner both cross-claimed against the automobile manufacturer under a theory of strict liability in tort for the amounts they paid in settlement to the automobile driver arising out of their negligence.

The *Simmons* court held that neither the truck driver nor the truck owner could proceed under a theory of strict liability in tort since they themselves had not suffered physical harm or personal injuries as required by section 402A of the Restatement (Second) of Torts. The court reasoned:

> We have held that the manufacturer owes a duty to the user or consumer or to his property. We then expanded that duty to [extend to] a third person who also suffered physical injury to his person or property.

> Section 402A and our decisions, however, have limited the seller's liability to the terms of the Restatement Rule which is "for physical harm thereby caused...." [The truck driver and owner] make no claim that they suffered physical harm. To extend the duty to include liability to others would mean that in all cases the seller or manufacturer is subjected to indemnity without regard to the independent torts of others.

558 S.W.2d at 860 (citations omitted). *See also Ling, Oliver, O'Dwyer Electric Co. Inc., v. Ladd Tool Co.,* 702 S.W.2d 658 (Tex.App.1985) (writ ref'd n.r.e.) (potential liability of claimant to injured third party not sufficient basis to permit strict liability action against manufacturer); *Foster v. Ford Motor Co.,* 616 F.2d 1304, 1314 (5th Cir.1980) (applying Texas law) (employer's liability to employee insufficient to predicate action in strict liability against manufacturer of defective tractor); *United Tractor, Inc. v. Chrysler Corp.,* 563 S.W.2d 850, 851 (Tex.Civ.App.1978) (purchaser of tractor not entitled to recover against manufacturer under section 402A if only damage he sustained was liability to others). The *Simmons* doctrine is not precisely applicable to the facts of this case since it applies when one tortfeasor seeks indemnity from another tortfeasor in strict liability in tort where the only loss of the first tortfeasor is liability to an injured third party. It does not, however, determine whether an otherwise economic loss is recoverable in strict liability where a defective product causes physical harm to other persons or property. *See Tokio Marine,* 17 Av.Cas. at 17,331 n. 6 (raising but not resolving issue of whether plaintiff who had suffered other property damage entitling it to strict liability in tort could recover amounts paid to injured third person in light of *Simmons* ). Nonetheless, because

*Simmons* focused on the Restatement language which requires a plaintiff to allege physical injury to himself, the Court finds that the payment of $130,000 to the family of the one of the victims did not convert United's otherwise economic loss into property loss recoverable in strict liability.

## 2. Theories of Recovery for Economic Loss

Defendants argue that United's economic loss is recoverable only under the Uniform Commercial Code and not in tort. They contend that the fact that third parties were killed in the crash in no way removes this restriction. United contends that the determination of whether injury to a defective product itself is recoverable in tort does depend on whether other persons or property were injured as a result of the crash, and not whether it was the party which suffered the additional damage. Accordingly, it argues that the fact that five persons were killed in the crash converts its otherwise economic loss into a loss recoverable in tort. In contrast, defendants suggest that the presence of other property loss or personal injury is relevant only if the additional losses are borne by the same party alleging the economic loss. The issue before the Court, then, is whether an otherwise economic loss (damage to the property itself) caused by a defective product is recoverable in tort because of the fact that third parties were injured as a result of the product's defect. Under the following analysis of Texas law the Court finds United cannot proceed under a theory of strict liability but can proceed under a theory of negligence.[7]

■ The starting point for analysis is the Texas Supreme Court's opinion in *Mid Continent,* 572 S.W.2d 308 (1978). In *Mid Continent,* a commercial buyer purchased "as is" a used airplane from a seller. The airplane lacked a crucial part and crashed causing severe damage to itself but no harm to any other person or property. The Texas Supreme Court labeled the buyer's loss an economic loss and held it was governed by the Uniform Commercial Code:

> The consumer protection needs upon which strict liability is based are not sufficiently strong to impose that theory of recovery over the existing sales law remedies for [the buyer's] loss in this case. In transactions between a commercial seller and a commercial buyer, when no physical injury has occurred to persons or other property, injury to the defective product itself is an economic loss governed by the Uniform Commercial Code. [The buyer's] cause of action for the damage of the airplane lies in breach of warranty as provided by the Code.

572 S.W.2d at 313. As a rationale for its holding the Court earlier quoted from an article by Dean Keeton:

> A distinction should be made between the type of "dangerous condition" that causes damage only to the product itself and the type that is dangerous to other property or persons. A hazardous product that has harmed something or someone can be labeled as part of the accident problem; tort law seeks to protect against this type of harm through allocation of risk. In contrast, a damaging event that harms only the product should be treated as irrelevant to policy considerations directing liability placement in tort. Consequently, if a defect causes damage limited solely to the property, recovery should be available, if at all, on a contract-warranty theory.

*Mid Continent,* 572 S.W.2d at 312 *quoting* Keeton, *Torts* in *Annual Survey of Texas Law,* 32 S.W.L.J. 1, 5 (1978). The above-cited language can be read to support plaintiff's position that as soon as injury to persons or property occurs, otherwise economic loss is recoverable in strict liability. *See S.J. Groves & Sons Co. v. Aerospatiale Helicopter Corp.,* 374 N.W.2d 431, 435–36 (Minn.1985) (Scott, J., dissenting) (suggesting that *Mid Continent* permits recovery in tort whenever the defect is part

---

**7.** The Minnesota Supreme Court, however, in response to a certified question by a federal district court, has recently held that an otherwise economic loss cannot be recovered in tort simply because other property or third persons were injured in the crash. *S.J. Groves & Sons, Co. v. Aerospatiale Helicopter Corp.,* 374 N.W.2d 431, 435 (Minn.1985).

of the "accident problem" under Dean Keeton's approach). However, a close reading of these cases leads the Court to conclude that under Texas law United cannot recover under a theory of strict liability.

The Court is so persuaded by a number of factors. First, a dissenting Justice in *Mid Continent* noted that the effect of the opinion was to confine recovery of damage to the product itself to theories of contract even if other persons or property were injured. *Mid Continent,* 572 S.W.2d at 317 (Pope, J. dissenting). Second, the language of the Restatement (Second) of Torts, section 402A as quoted by the Texas Supreme Court in *Signal Oil & Gas v. Universal Oil Products,* 572 S.W.2d 320 (Tex.1978) a companion case to *Mid Continent,* also supports defendant's position. That section provides:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to *his property* is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to *his property....*

*Signal Oil,* 572 S.W.2d at 325 (emphasis in original). This emphasis on ownership of the damaged property also is reinforced by *Mid Continent's* citation to *Cooley v. Salopian Industries, Ltd.,* 383 F.Supp. 1114, 1119 (D.S.C.1974) in which a federal district court interpreted section 402A to require that plaintiffs either allege physical harm to *themselves* or to *their* property (emphasis added). Finally, in *Tokio Marine,* 17 Avi.Cas. 17,321, 17,330 (S.D.Tex.1982) a federal district court applying Texas law noted that "if [plaintiff] suffered personal injuries and/or property damage beyond the damage to the helicopter itself, a cause of action in strict liability would lie against the manufacturer of the helicopter." Thus, *Tokio Marine* strongly suggests that whether economic loss is recoverable in strict liability depends on whether the party alleging the economic loss has also suffered personal injury or other property damage. As a result the Court finds that since United have suffered only economic loss, their claims of strict liability in tort against both defendants must be dismissed.

United is not, however, precluded from recovering economic loss under a theory of negligence. In *Nobility Homes v. Shivers,* 557 S.W.2d 77, 83 (Tex.1977) the Texas Supreme Court held that economic loss not recoverable in strict liability was recoverable under both theories of breach of implied warranty and negligence. In permitting economic loss to be recovered in negligence but not in strict liability *Nobility* represents a minority position. L. Frummer & M. Friedman, 2 *Products Liability* § 3.01[2] at 3–40 n. 17 (1986) and cases cited therein; *contra. S.J. Groves & Sons Co. v. Aerospatiale Helicopter Corp.,* 374 N.W.2d 431, 435 (Minn.1985) (economic loss recoverable only in contract). Nonetheless, that portion of the *Nobility* decision permitting recovery for economic loss under a negligence theory has not been overruled by later decisions. In *Mid Continent* the negligence theory was not before the court since the defendants who appealed had only been found liable under a theory of strict liability. 572 S.W.2d at 310. Moreover, the court's opinion distinguished solely between contract claims and claims under strict liability, never once mentioning the negligence theory sanctioned by *Nobility.* In *Signal Oil,* the trial court had disallowed plaintiff's negligence claim on the grounds that it had been contributorily negligent. 572 S.W.2d at 323. The court therefore explicitly confined its discussion to whether causes of action in strict liability and implied warranty could be maintained. 572 S.W.2d at 323–31. *See also Tokio Marine,* 17 Av. Cas. at 17–330–17–332 (separately analyzing claims for warranty, negligence and strict liability and noting that economic loss doctrine dictates only whether claim may be brought under strict liability). Accordingly, even if United's claim is for economic loss alone, under *Nobility Homes* it still may proceed to recover the loss under a negligence cause of action, unless it is otherwise barred by the contract language.

## C. Disclaimer of Warranties and Limitation of Remedies

Defendants argue that paragraph 6 of the contract explicitly provides a limited

express warranty with specific and limited remedies. They also claim that the warranty disclaimer in paragraph 9 negates any possible implied warranties of merchantability or fitness for a particular purpose which would have otherwise arisen from the sale. In addition, defendants allege that the language in paragraph 9 disclaiming liability for incidental and consequential damages bars all of plaintiffs' claims based on negligence or strict liability. Defendants stress the equal bargaining power between the parties and urge the Court to limit the plaintiffs to the remedies bargained for in the contract which have all expired.

Plaintiffs contend first that since the contract is only between United and Aircraft International, the warranty disclaimer and limitation of remedies provisions in no event apply to Heavy Industries, the manufacturer of the aircraft. Second, they argue that the express warranty in paragraph 6 is contradicted and supplemented by statements made by defendants during their advertising and marketing of the aircraft.[8] Alternatively, plaintiffs argue that the limited remedies provided for in paragraph 6 concern remedies only for repair or replacement of defective materials and workmanship and do not limit express warranties of quality or performance. In addition, plaintiffs suggest that the limited remedies provided for fail of their essential purpose, thus inviting the Court to fill them in with general gap-filling remedy provisions of the Texas Uniform Commercial Code. Finally, plaintiffs contend that the tort disclaimer in the contract is insufficient as a matter of law to bar plaintiffs' negligence and strict liability claims. Each of these contentions requires delving into the Texas Commercial Code and other Texas law.

## 1. Liability of Defendant Heavy Industries

■ The first issue raised by plaintiffs is whether any of the warranty disclaimers or limitation of remedy provisions in the contract apply to defendant Heavy Industries, since Heavy Industries was not a party to the contract.[9] Under Texas law a warranty of merchantability is implied into all contracts for the sale of goods. Tex.Bus. & Comm.Code Ann. (Vernon 1968). The implied warranty of merchantability is in part a warranty that the goods "are fit for the ordinary purpose for which such goods are used." Tex.Bus. & Comm.Code Ann. § 2.314(b)(3) (Vernon 1968). This warranty can be disclaimed by the manufacturer but he cannot rely on a disclaimer of a subsequent retailer to insulate himself. *Clark v. DeLaval Separator Corp.*, 639 F.2d 1320 (5th Cir.1981) (applying Texas law). To disclaim the implied warranty of merchantability the manufacturer "must be able to point to a disclaimer which expressly mentions him as excluding certain or all implied warranties." *DeLaval*, 639 F.2d at 1324; *Rocky Mountain Helicopters, Inc. v. Bell Helicopter Co.*, 491 F.Supp. 611, 621–22 (N.D.Tex.1979) (applying Texas law) (although manufacturer of helicopter had effectively disclaimed all implied warranties there was no evidence in the record regarding whether the separate manufacturer of the helicopter's clutch had also disclaimed any implied warranties regarding its product; as a result summary judgment was inappropriate unless and until the court could ascertain if it had done so); *Henderson v. Ford Motor Co.*, 547 S.W.2d 663 (Tex.Civ.App.1977) (manufacturer's implied warranty disclaimed by retailer's contract language which explicitly indicated manufacturer also disclaimed warranties). Because the disclaimer by Aircraft International did not specifically mention Heavy Industries, Heavy Industries is bound by

**8.** Specifically, plaintiffs allege that defendants "expressly warranted through their marketing that this aircraft was suitable for flying by the non-professional pilot and was ideal for corporate executives that also held pilots' licenses, and induced the same to purchase this sophisticated aircraft, and leading them to believe that Flight Safety training would adequately prepare

them for piloting the aircraft." *See* Amended Complaint Count VII, par. 12 at 20–21.

**9.** The contract specifically provides that any references to "'Mitsubishi' or 'MAI' shall mean Mitsubishi Aircraft International, Inc., San Angelo, Texas." *See* Retail Purchase Order, par. 1(A).

the implied warranty of merchantability with respect to the plane sold to United. Since Heavy Industries is not a party to the contract, its motion for summary judgment as a matter of law on theories of breach of implied warranty of merchantability and negligence should be denied if under Texas law the plaintiffs are entitled to proceed against it under those theories.

 The fact that none of the plaintiffs are in privity [10] with Heavy Industries does not bar an action for breach of implied warranty for economic loss. *Nobility Homes, Inc. v. Shivers,* 557 S.W.2d 77 (Tex. 1977). In addition, since Heavy Industries cannot claim the benefit of the disclaimer provisions in the contract, it is also subject to a cause of action for negligence. While a manufacturer can disclaim liability for negligence, the contract language to that effect must be clear and unequivocal. *Allright, Inc. v. Elledge,* 515 S.W.2d 266 (Tex. 1974). Since Heavy Industries has made no such disclaimer, it is subject to a cause of action for negligence.

### 2. Liability of Defendant Aircraft International

#### a. Breach of Warranty

Since Aircraft International is a party to the purchase order, the contractual language is the starting point for an analysis of its potential liability. In paragraph 6 of the contract Aircraft International warranted the airplane, excluding avionics not manufactured by it, against defective materials or workmanship if it was promptly notified of the defect and given satisfactory evidence of it. The warranty covers the full costs to remove, repair and reinstall replacement of parts for the first twelve months, but with the labor charges involved assumed by Aircraft International only for the first six of those months. In addition, the warranty also provided that

within the earlier of the first 1,500 flight hours or thirty-six months Aircraft International would repair or replace defective parts of the fuselage, empennage and control surfaces, with labor costs to be assumed by the buyer.

Plaintiffs' first argument is that the limited express warranty in paragraph 6 was contradicted and thus supplemented by express warranties of safety and fitness for licensed corporate users made by defendants in their marketing and advertising of the aircraft. Defendants deny this allegation. Answer to Amended Complaint at 6, par. 18. Plaintiffs' argument fails for two reasons. First, in making this argument plaintiffs are simply repeating verbatim the allegation in their complaint. Plaintiffs have failed to provide any shred of evidence regarding alleged statements made by defendants in their marketing of the aircraft.[11] It is well settled that in a motion for summary judgment the non-moving party may not merely rest upon the allegations or denials of the party's pleading, but must set forth specific facts, by affidavits or otherwise, showing there is a genuine issue for trial; Fed.R.Civ.P. 56(e); *Salinas v. School District of Kansas City,* 751 F.2d 288, 289 (8th Cir.1984). Here, plaintiffs are merely reiterating the allegations in their complaint and have not complied with Rule 56(e).

 Second, as regards defendant Aircraft International, the contract provides it alone contains all agreements, express or implied, either oral or in writing between the parties. Purchase Order par. 10. In addition, paragraph 9 of the contract states that the warranties made in paragraphs 6 and 7 *with respect to the airplane* are in lieu of all other warranties, express, statutory or implied in fact or in law. These contractual provisions preclude any assertion by plaintiffs of other express warran-

---

**10.** Privity is a direct contractual relationship between the parties. *See* 2 L. Frumer & M. Friedman, Products Liability § 3.02[3] at 3–142–143 (1987).

**11.** Plaintiffs erroneously contend that defendant do not deny making statements in their marketing campaign which functioned as express warranties of quality. This is simply not the case. *See* Answer to Amended Complaint at 6, par. 18.

ties concerning the aircraft.[12] The Texas Uniform Commercial Code provides:

> (a) Words or conduct relevant to the creation of an express warranty and words or conduct tending to negate or limit warranty shall be construed wherever reasonable as consistent with each other; but subject to the provisions of this chapter on parol or extrinsic evidence [section 2.202] negation or limitation is inoperative to the extent that such construction is unreasonable.

Tex.Bus. & Comm.Code § 2.316. The reference to the parol evidence rule of section 2.202 is meant to insulate the seller "against false allegations of oral warranties." Tex.Bus. & Comm.Code U.S.C. § 2.316, Comment 2. *See McLain v. Hodge*, 474 S.W.2d 772, 776 (Tex.Civ.App. 1971) (writ ref'd n.r.e.) (noting that creation of express warranties by conduct or words is subject to section 2.202 of the Texas Uniform Commercial Code). Aircraft International carefully specified that it was limiting its warranties to those found in the contract, and equally carefully specified that the written terms of the contract constituted the entire agreement between the parties. The Court finds that plaintiffs should not be entitled to escape this limitation by seeking to introduce parol evidence of other express warranties. *See, e.g., Southerland v. Northeast Datsun, Inc.*, 659 S.W.2d 889 (Tex.App.1983) (parol evidence as to existence of oral warranties precluded where contract unambiguously stated that no warranties existed unless they were in writing); *Rogers v. J.I. Case Co.*, 272 S.W.2d 429 (Tex.Civ.App.1954) (clause in written contract for sale of hay baler providing writing constituted entire contract between parties effectively barred plaintiff from introducing any evidence of oral promises or warranties).

█ Plaintiffs' second line of attack is that the wording of disclaimer provisions in paragraph 9 extends only to the limited warranties made in paragraph 6 and does not disclaim any express warranties of quality. The disclaimer provision in paragraph 9 provides:

> The warranties contained in paragraphs 6 and 7 with respect to the Airplane and installation of the Avionics, and the warranty of Manufacturers of the Avionics equipment and components and of the engines referred to in paragraphs 7 and 8 are expressly in lieu of (and Purchaser hereby waives) all other warranties, expressed, statutory, or implied in fact or in law; and it is further agreed that THERE ARE NO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE MADE IN CONNECTION WITH THE SALE OF THE AIRPLANE, ENGINES AND ALL AVIONICS AND COMPONENT PARTS.

Paragraph 6 begins with "[t]he Airplane, excluding avionics, engines and other equipment not manufactured by MAI shall be covered by the following warranty...." The language of the contract plainly states that certain specific warranties cover the plane, and then provides there are no other warranties on it. The Court rejects plaintiffs' argument that the wording of the contract does not disclaim express warranties of quality.

Plaintiffs' third argument is that the limited repair or replace remedies provided for under the contract fail of their essential purpose. Section 2.719(b) of the Code provides:

> Where circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this chapter.

Tex.Bus. & Comm.Code Ann. (Vernon 1968). Plaintiffs allege that because the latent design defect was undiscovered until the crash, the limited remedies provided for

---

**12.** On the other hand, the scope and content of any advertisements might be relevant as regards plaintiffs' cause of action against Heavy Industries for negligent design. *See Texas Bitulithic Co. v. Caterpillar Tractor Co.*, 357 S.W.2d 406 (Tex.Civ.App.1962) (writ ref'd n.r.e.) (manufacturer may be held liable for negligent design where he sponsored advertising aimed at ultimate users extolling virtue, utility, and quality of his products). Moreover, plaintiff trustees who are not parties to this motion may still avoid summary judgment on the advertisement issue if they are able to provide some evidence thereof.

in the contract failed of their essential purpose. Defendants first contend that since United had the plane repaired several times during the warranty period, the remedies could not be said to have failed of their essential purpose. This argument is irrelevant as concerns a latent design defect. Defendants' second argument is that the plaintiffs' allegations of faulty design are barred by the time limits in the warranty clause. *See* Defendants' Memorandum of Law in Support of Motion for Summary Judgment at 8–10. This argument concedes that had United discovered the faulty design within the warranty period it would have had a remedy and thus that the language in the warranty provision "Mitsubishi Aircraft International, Inc.... warrants the airplane ... against defects in materials and workmanship" does in fact cover claims for faulty design. This is significant in that defendants are not claiming that the stringent warranty language excluded claims for faulty design under Tex.Bus. & Comm.Code Ann. § 2.316, thus possibly precluding any resort to analysis under section 2.719(2) or (3).[13] *See* McNichols, *Who Says that Strict Tort Disclaimers Can Never Be Effective? The Courts Cannot Agree* (hereinafter "Tort Disclaimers"), 28 OKL.L.REV. 495, 501 (1975) (noting sellers can avoid unconscionability of remedies limitations under 2.719 by entirely disclaiming warranties under section 2.316); J. White & R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 12–12 at 394–95 (1st ed. 1972) (noting that if seller disclaims warranties under section 2.316 there can be no breach of warranty and thus no consequential damages or the need for any limitation thereof giving rise to a section 2.719 analysis). Thus, an analysis of whether the limited remedies failed of their essential purpose within the meaning of section 2.719(2) is appropriate.

Cases invoking section 2.719(2) involve two sorts of problems: (1) latent defects not discoverable by buyer's inspection, and (2) instances where the seller is unable or unwilling to provide the remedy called for under the contract. Anderson, *Failure of Essential Purpose and Essential Failure on Purpose: A Look At Section 2–719 of the Uniform Commercial Code*, 31 S.W. L.J. 759, 764 (1977). Texas cases have involved the latter. *See, e.g., Lankford v. Rogers Ford Sales*, 478 S.W.2d 248 (Tex. Civ.App.1972) (writ ref'd n.r.e.) (where dealer made repairs and did not repudiate warranty exclusive remedy of repair and replacement did not fail of its essential purpose); *Henderson v. Ford Motor Co.*, 547 S.W.2d 663 (Tex.Civ.App.1977) (same); *Fredonia Broadcasting Corp. Inc. v. RCA Corp.*, 481 F.2d 781, 798 (5th Cir.1973) (same). This case involves a hybrid situation in which a defect, allegedly undiscoverable except by serious mishap, was "discovered" after the limited repair or replace warranty period had expired. No Texas law is directly applicable to these facts.

The leading case on undiscoverable defects is *Wilson Trading Corp. v. David Ferguson, Ltd.*, 23 N.Y.2d 398, 297 N.Y. S.2d 108, 244 N.E.2d 685 (1968). In *Wilson* a seller sold a buyer some yarn under a contract which provided that all claims by a buyer to be made within ten days of receipt of shipment. During processing, the yarn faded and could not be used by the buyer. The New York Court of Appeals remanded the case to the trial court on the grounds that if the buyer could not discover the defects before the processing, then the ten-day limit on claims would have failed of its essential purpose. 297 N.Y.S.2d at 112, 244 N.E.2d at 688. The *Wilson* reasoning has been criticized by commentators for overly simplistic analysis. *See, e.g.,* J. White and R. Summers, *Handbook of the Law Under the Uniform Commercial Code*, § 12–10 at 381. ("The stipulated remedy may have been unreasonable or unconscionable (and unenforceable for that reason), but it did not fail to achieve its essential purpose—to indemnify the buyer against latent defects that could have been discovered within ten days"); Eddy, *On the "Essential" Purposes of Limited Remedies: The Metaphysics of UCC Section*

---

**13.** The Court accordingly does not reach the issue of whether a seller of a new airplane can disclaim warranties of airworthiness under Texas law.

2–719(2) (hereinafter "Metaphysics"), 65 CAL.L.REV. 28, 37 (1977) (criticizing *Wilson* court for overlooking the many possible purposes served by limitation period such as a means of parties choosing to allocate risks).

One commentator has suggested that section 2.719(2) calls for a three-step analysis in determining whether a limited remedies provision fails of its essential purpose:

> 1) determination of the purposes underlying a provision; 2) determination whether application of the remedy in the particular circumstances will further those purposes (or whether there has instead been a "failure of essential purpose"); 3) if the clause does not fail of its essential purpose, determination whether furtherance of the purpose works an unconscionable result.

Eddy, *Metaphysics*, at 33. A slightly different approach is set out in Comment 1 to section 2.719 of the Texas Code:

> Similarly, under subsection (2), where an apparently fair and reasonable clause because of circumstances fails in its purpose or operates to deprive either party of the substantial value of the bargain, it must give way to the general remedy provisions of this Article.

Tex.Bus. & Comm.Code Ann. (Vernon 1968). *See, e.g., Mercedes Benz Inc. v. Dickenson,* 720 S.W.2d 844 (Tex.App.1986) (test of whether remedy failed of its essential purpose was whether party was deprived of substantial value of its bargain). Under this approach the Court must first determine what the bargain was before deciding whether any party has been deprived of it. Eddy, *supra*, at 33; *See also* R. Nordstrom, *Handbook of the Law of Sales*, 276 (1976) (noting that remedies do not have purposes or an essential purpose; only people do).

Not surprisingly, both parties have divergent views of the scope of their bargain. Nothing in the record is particularly helpful in ascertaining the purpose of the time period limitation for repair and replacement of defective parts and workmanship. The crucial question is whether the parties were knowingly allocating risks of latent or undiscoverable design defects to the purchaser after the expiration of the warranty period, or whether the eventuality of a design defect represents "novel circumstances not contemplated by the parties." 1 *Report of the Law Review Commission for 1955* at 584. *See, e.g., Posttape Assocs. v. Eastman Kodak Co.,* 450 F.Supp. 407, 411–12 (E.D.Pa.1978) (latent nature of film defects was contemplated by both parties and was essential reason for clause limiting seller's liability for negligent manufacturing to replacement of defective film and thus remedy did not fail of its essential purpose).

A reasonable interpretation of the purpose of the time limitation clause is that Aircraft International sought to minimize its responsibility for breakdowns which would naturally be expected to occur after a certain amount of wear and tear, and thus neither party contemplated the applicability of the clause to the context of a latent design defect. *Cf. Riley v. Ford Motor Co.,* 442 F.2d 670, 673 n. 5 (5th Cir.1971) (noting that "at some point in time, it must become obvious to all people that a particular vehicle simply cannot be repaired or parts replaced so that the same is made free from defect"), *citing General Motors Corp. v. Earnest,* 279 Ala. 299, 184 So.2d 811, 814 (1966). However, even if the Court assumed that the purpose of the limited repair and replace clause was in fact to allocate risks of latent defects discovered after that period to the buyer, the defendants nonetheless are still subject to the argument that the time limitations, as applied to an inherent design defect, were manifestly unreasonable within the meaning of Tex.Bus. & Comm.Code Ann. § 1.204(a) (Vernon 1968). That section provides:

> Whenever this title requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable may be fixed by agreement.

This provision was relied on by the United States Court of Appeals for the Third Circuit in *Neville Chemical Co. v. Union Carbide Corp.,* 422 F.2d 1205 (3d Cir.), *cert. denied,* 400 U.S. 826, 91 S.Ct. 51,

27 L.Ed.2d 55 (1970) where the court refused to enforce a fifteen-day notice requirement with respect to defects in an oil which was to be manufactured into a resin. *Neville* involved an oil which was manufactured to the buyer's specifications. The oil proved defective when the manufacturer, without advising the buyer, suddenly altered its manufacturing process resulting in the contamination of the product by another chemical. As a result, the buyer soon received complaints from its customers that products containing the oil emitted noxious odors. Under the circumstances the court found the fifteen-day time limitation unreasonable. 422 F.2d at 1217. *See also Community Television Services, Inc. v. Dresser Industries, Inc.*, 586 F.2d 637 (8th Cir.1978) (trial court held six-month limitation on discovery and notification of defects was manifestly unreasonable within the meaning of U.C.C. § 1.104 in the context of the collapse of a television tower which had a twenty-five year life expectancy), *cert. denied*, 441 U.S. 932, 99 S.Ct. 2052, 60 L.Ed.2d 660 (1979). The Court finds that the time limitations provided in the contract are manifestly unreasonable as applied to an alleged latent design defect. Whether or not a buyer can recover under a warranty for negligent design of an aircraft should not depend on whether the ice storm which reveals the defect occurs within the time limitations specified in the contract. Thus, plaintiffs' allegations of design defect preclude the granting of summary judgment on the breach of warranty claim.

The comment to section 2.719 recognizes "it is of the very essence of a sales contract that at least minimum adequate remedies be available." Tex.Bus. & Comm.Code Ann. Comm. 1 (Vernon 1968). As the the trial court in *Neville* had stated in rejecting a limitation limiting the buyer's remedies to refund of the purchase price:

> Such a [limited] remedy would be wholly inadequate in the case of a latent defect not discoverable within a reasonable period after receipt of shipment. Like the fifteen day [notice] limitation, it is obviously designed to cover a situation where the defect is discoverable upon receipt of shipment, reasonable inspection and prompt discovery of defects.

294 F.Supp. 649, 655 (W.D.Pa.1968). If the alleged defective design caused the crash, then defendants cannot "repair or replace" its defective parts and must be required to replace the plane or refund its value. *Cf. Riley v. Ford Motor Co.*, 442 F.2d 670, 673 (5th Cir.1971) (applying Alabama law) (upholding implied jury finding that warranty deprived buyer of substantial value of car where warrantor was unable to correct defects); *American Elec. Power Co. v. Westinghouse Elec. Corp.*, 418 F.Supp. 435, 459 (S.D.N.Y.1976) (if defendant totally failed to perform under the warranty plaintiff entitled to either new generator or refund of purchase price).

Therefore, defendants' motion to dismiss for breach of the contract warranties as to Aircraft International will also be denied.

**b. Negligence**

██ Paragraph 9 of the purchase order provides that the repair and replace remedies listed in the contract are the exclusive remedies of the buyer and that:

> Mitsubishi's obligations and liabilities hereunder are in lieu of all other obligations, liabilities and duties which Mitsubishi might otherwise have for any loss, expense, or damage arising out the sale, use or operation of the products purchased herein, whether direct or consequential, and whether caused by Mitsubishi's negligence or otherwise.

Accordingly, an issue exists whether plaintiffs are entitled to maintain a cause of action in negligence against Aircraft International. Texas law recognizes the validity of exculpatory clauses in commercial contexts between parties of equal bargaining position. *Allright, Inc. v. Elledge*, 515 S.W.2d 266 (Tex.1974) (bailment contract). This exception to the general rule that a party cannot immunize itself from its own negligence rests on the principle that "businessmen can bargain over which party is to bear the risk of damage and set the price accordingly, thus achieving a more rational distribution of the risk than the law would otherwise allow." *JIG The Third Corp. v.*

*Puritan Marine Ins. Underwriters Corp.*, 519 F.2d 171, 176 (5th Cir.1975), *cert. denied, sub nom. Atlantic Marine, Inc. v. JIG The Third Corp.*, 424 U.S. 954, 96 S.Ct. 1429, 47 L.Ed.2d 360 (1976). The contractual disclaimer language must, however, be clear and unequivocal. *Elledge, supra.* Here, the contract specifically states that Aircraft International intends to immunize itself from its own negligence but only for liability arising out of sale, use or operation of the aircraft. The clause does not refer to losses arising out of design defects and thus the Court finds it is not effective to preclude an action based on negligent design. This is consistent with the rule that contracts are construed strictly against the drafter. *Temple-Eastex Inc. v. Addison Bank*, 672 S.W.2d 793, 798 (Tex.1984). Faced with a similar clause one court has held that a disclaimer which limited liability arising out of "manufacture, sale, delivery, use or resale" did not encompass liability arising out of negligent design and so held that an injured plaintiff could proceed against the manufacturer on a theory of strict liability. *South Carolina Electric & Gas Co. v. Combustion Engineering, Inc.*, June 1984—August 1985 Transfer Binder CCH Product Liability Rep. # 10,357 27,251 at 27,254 (S.C.Ct.App.1984). A seller of a non-experimental commercial aircraft bears a very heavy burden in the event it wishes to disclaim liability for negligent design. Aircraft International has not met that burden.

**Tail Flow Separation**

Defendants also move for summary judgment as to plaintiffs' "tail flow separation theory." In support of this theory, plaintiffs allege that the Mitsubishi aircraft was defective in that it did not include a satisfactory "de-icing" mechanism (a de-icing "boot"). Plaintiffs allege that due to the defective design of the aircraft, ice built up on the horizontal stabilizer, causing a disturbance of air flow over the tail, which in turn caused the plane to go into a spin from which it did not recover.[14]

Plaintiffs' tail flow separation theory is based upon the opinions of its expert witnesses. Plaintiffs' former weather expert, Dr. Daniel Sowa, analyzed meteorological data for the St. Cloud area and provided estimates of the "liquid water content" and temperature of the atmosphere at various altitudes on the date in question (Dec. 6, 1980). These figures were provided to Dr. Kenneth Korkan who, in turn, converted the tables into expressions of grams of water per cubic meter of air, and based on these figures calculated probable ice build-up on the plane. Korkan's calculations were provided to Dr. Kenneth Orloff, who calculated the potential for disruption of the airflow over the unprotected surfaces of the horizontal stabilizer, based on the ice build-up data provided by Korkan. Orloff concluded that ice build-up on the stabilizer was a primary cause of the crash.

Subsequently, plaintiffs' meteorology expert, Dr. Sowa, was dismissed by plaintiffs in a billing dispute. The Magistrate ordered that the plaintiffs retain a new expert and further ordered that none of Sowa's deposition testimony would be admissible at trial. Plaintiffs retained a new weather expert, John McMurray.[15] McMurray used the identical raw data as that used by Sowa; however, rather than calculating "liquid water content" at various altitudes, McMurray calculated "water vapor" at various altitudes.

Defendants now bring this motion for partial summary judgment as to plaintiffs' tail flow separation theory of causation. Defendants contend that because McMurray's test results differ significantly from those reached by Sowa, the conclusions reached by Korkan and Orloff are no longer valid. Defendants claim that, because the Korkan and Orloff opinions are based on data provided by Sowa, and because

---

14. More specifically, plaintiffs allege that from .4 to .7 inches of ice accumulated on the lower surface of the plane's horizontal tail, which disturbed the air flow and reduced the efficiency of the stabilizer, resulting in a loss of control and crash of the plane.

15. Based upon plaintiffs' representations that McMurray's opinions were identical to those of Sowa, Mitsubishi did not oppose Sowa's withdrawal and the designation of McMurray.

Sowa's data is no longer a part of the record in this case, plaintiffs' tail flow separation theory has collapsed like a "house of cards" and defendants are entitled to summary judgment as to that theory.

■ Plaintiffs argue convincingly that summary judgment is inappropriate in this matter, for several reasons. First, plaintiffs argue that the difference between "water vapor" and "liquid water content" is largely one of semantics. McMurray calculated a water vapor value within a range of 2.8 to 4.3 grams per kilogram. Although Sowa and McMurray employed different terms, they were talking about essentially the same thing—*i.e.*, the amount of water in the atmosphere. In his deposition McMurray repeatedly states that liquid water content and water vapor are terms which can be used interchangeably and which refer, in essence, to a single meteorological concept.

Second, defendants' own expert came to the conclusion that the McMurray and Sowa figures are essentially identical. John Graf, a meteorologist, was employed by defendants to compare the McMurray and Sowa findings. Graf was expressly asked whether Sowa and McMurray had analyzed the same raw data and come to the same conclusions. Graf replied that Sowa and McMurray had reached "approximately the same opinion." Deposition of John Graf 95–96.[16]

Third, plaintiffs have submitted the affidavit of Kenneth Korkan in which Korkan states that he has analyzed *McMurray*'s findings, and based on those findings, he "reaches the same opinions and conclusions" as reached by him based on the Sowa findings. Affidavit of Kenneth Korkan par. 2. Of course, if Korkan's conclusions as to ice build-up are unchanged, then Orloff's conclusions, which are expressly

based on Korkan's figures, also retain their validity.

In sum, although defendants have identified a number of weaknesses in plaintiffs' expert testimony, this alone is not a basis for summary judgment. Defendants' motion will be denied.

**PLAINTIFFS' MOTIONS**

**I. Pitot-Static Airspace System**

■ Plaintiffs move the Court for a ruling, under the doctrine of collateral estoppel, that the "Pitot-static airspeed system" installed on the plane sold to United was unreasonably dangerous and defective under Minnesota law. The Court will deny this motion. Plaintiffs rely exclusively on a decision of a federal district court in Texas, applying Texas law, which found that an identical system on a different Mitsubishi plane was defective and a producing cause of the plane's crash. *Moorehead v. Mitsubishi Aircraft International, Inc.*, 639 F.Supp. 385, 401 (E.D.Tex.1986). Defendants argue that the *Moorehead* case should not be given collateral estoppel effect.

A Pitot-static airspeed system provides the pressure necessary to operate three flight instruments: 1) the pressure altimeter, which indicates altitude; 2) the vertical speed indicator; and 3) the airspeed indicator. Plaintiffs' Memorandum of Point and Authorities (Plaintiffs' Memorandum) at 6. The Pitot-static system operates in part by measuring the pressure inside a Pitot tube, located on the nose of MU–2 airplanes. Pressure in the tube varies according to height or speed which produces different instrument readings. Accurate airspeed readings from these instruments are essential because "[w]ithout a usable airspeed indication system, the pilot may exceed certain airplane limitations and experience difficulty controlling the airplane." *Special*

**16.** In his deposition Graf made the following statements:

Q. Would it be fair to say that you have not made a comparison between Dan Sowa's transcript and Mr. McMurray?

A. Mentally I have. From looking at the McMurray transcript, I mentally brought back to recall the Sowa indication of the gr./kg., and at that particular point I said to myself

apparently they are trying to run the computation the same way and it just isn't right.

Q. In other words, you found both gentlemen had taken the data and come up with the same opinion?

A. Approximately the same opinion, that's correct sir.

Graf Dep. 95–96.

*Certification Review of Mitsubishi MU–2, Final Report,* at S5–2 (1984).

In *Moorehead,* a case involving the crash of a Mitsubishi MU–2B–25 aircraft [17], a federal district court found that the Pitot-static airspeed system, identified as PH–506, was defective and that the defect was a producing cause of the crash. 639 F.Supp. at 401. The *Moorehead* case is presently on appeal to the Fifth Circuit. The case involved the same PH–506 Pitot-static airspeed system found on the airplane in the case at bar; moreover, Aircraft International was also a defendant in the *Moorehead* case. As a result, plaintiffs argue that under the principle of collateral estoppel the Court should hold that the PH–506 Pitot-static airspeed system on the plane in the case at bar was defective and unreasonably dangerous.

Plaintiffs in this case invoke the doctrine of offensive nonmutual collateral estoppel. Offensive collateral estoppel permits "a litigant who was not a party to a prior judgment [to] use that judgment 'offensively' to prevent a defendant from relitigating issues resolved in the earlier proceeding." *Parklane Hosiery v. Shore,* 439 U.S. 322, 326, 99 S.Ct. 645, 649, 58 L.Ed.2d 552 (1979) (footnote omitted). The estoppel here is nonmutual because plaintiff insurers would not have been bound by an adverse decision in the *Moorehead* case. *Setter v. A.H. Robbins,* 748 F.2d 1328, 1330 (8th Cir.1984). Collateral estoppel serves "the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." [18] *Parklane,* 439 U.S. at 326, 99 S.Ct. at 649, *citing Blonder-Tongue Laboratories, Inc. v. University of*

*Illinois Foundation,* 402 U.S. 313, 328–29, 91 S.Ct. 1434, 1442–43, 28 L.Ed.2d 788 (1971).

## A. Choice of Law

██ As a preliminary issue the Court must decide whether state or federal law determines the collateral estoppel effect of a prior judgment of a federal court sitting in diversity. In federal diversity actions collateral estoppel is generally an issue of the forum state's substantive law. *Kuehn v. Garcia,* 608 F.2d 1143, 1147 (8th Cir. 1979), *cert. denied,* 445 U.S. 943, 100 S.Ct. 1340, 63 L.Ed.2d 777 (1980). However, courts are divided over whether federal or state law determines the preclusive effect a federal court sitting in diversity must accord to a prior federal diversity judgment. *Gerrard v. Larsen,* 517 F.2d 1127, 1132–33 (8th Cir.1975). The argument for applying federal law is that "it would be a strange doctrine to allow a state to nullify the judgments of federal courts constitutionally established and given power also to enforce state created rights." *Kern v. Hettinger,* 303 F.2d 333, 340 (2d Cir.1962). The rationale for applying state law is that the *Erie* doctrine and the Full Faith and Credit clause, as supplemented by 28 U.S.C. § 1738 require federal courts to give the same effect to a prior federal judgment that state courts would have to give to a prior state court judgment. *Semler v. Psychiatric Institute, Inc.,* 575 F.2d 922, 927–28 (D.C.Cir.1978). The Eighth Circuit in *Gerrard* noted the split of authority but declined to take a position. 517 F.2d at 1132. It has yet to resolve the issue.[19]

██ In this case application of either Minnesota or federal collateral estoppel law will not change the outcome. Un-

---

17. The case at bar involves the crash of a MU–2B–40 plane. However, the Pitot-static system on this plane was the identical PH–506 system as on the MU–2B–25 plane in *Moorehead.*

18. Only the latter goal would ostensibly be served in this case.

19. In *Gatzemeyer v. Vogel,* 589 F.2d 360, 362 (8th Cir.1978) the Eighth Circuit applied state law in determining the collateral estoppel effect of prior federal diversity judgment on a subse-

quent diversity case in the same state. Whether to apply federal or state law was not an issue in the case, and the Eighth Circuit did not even mention that it was resolving the issue left open in *Gerrard.* Similarly, in *Iowa Electric Light and Power Co. v. Mobile Aerial Towers, Inc.,* 723 F.2d 50, 52–53 (8th Cir.1983) the Eighth Circuit again without comment applied state law in a case involving successive diversity cases. Accordingly, these two cases cannot be viewed as having decided *sub silentio* an issue expressly left open in *Gerrard.*

der federal common law four factors are required for the application of collateral estoppel: (1) the issue involved must be identical to the issue involved in the prior action; (2) there must have been a final judgment on the merits in the prior action; (3) the estopped party was a party or a party in privity with a party to the prior action; and (4) the estopped party had a full and fair opportunity to litigate the adjudicated issue. *Oldham v. Pritchett,* 599 F.2d 274, 279 (8th Cir.1979). The Minnesota requirements are the same.[20] The Court chooses to follow the emerging trend following the view of the Restatement (Second) of Judgments, § 87 (1980) that federal law controls the effect to be given to a prior federal judgment. *See Hunt v. Liberty Lobby Inc.,* 707 F.2d 1493, 1496 (D.C.Cir.1983) (noting that in applying federal law it was joining "a burgeoning majority of federal courts"); *Precision Air Parts, Inc. v. Avco Corp.,* 736 F.2d 1499, 1503 (11th Cir.1984), *cert. denied,* 469 U.S. 1191, 105 S.Ct. 966, 83 L.Ed.2d 970 (1985); *Hardy v. Johns-Manville Sales Corp.,* 681 F.2d 334, 337 (5th Cir.1982).

The seminal federal case on offensive collateral estoppel is *Parklane Hosiery v. Shore,* 439 U.S. 322, 331, 99 S.Ct. 645, 651, 58 L.Ed.2d 552 (1979) where the United States Supreme Court granted "trial courts broad discretion to determine when [offensive collateral estoppel] should be applied," and outlined the factors to be considered in exercising that discretion. Among the factors discussed was whether the present plaintiff could have joined as plaintiff in the prior proceeding, whether use of the doctrine would be unfair to the defendant, and whether the defendant would be deprived of procedural opportunities not available in the first action. 439 U.S. at 330–31, 99 S.Ct. at 651–52.

The Court finds collateral estoppel is not appropriate in this action for three reasons.

First, the issue decided in the Moorehead case is not identical to the issue here. Second, defendant did not have a full and fair opportunity to litigate the issue in *Moorehead.* Third, applying collateral estoppel in this case would not significantly promote judicial economy.

**B. Identity of Issues**

The threshold requirement for applying collateral estoppel is that the same issue that was decided in one case arises in another. Wright, Miller and Cooper, *Federal Practice and Procedure: Jurisdiction* § 4417 at 148 (1981). Plaintiffs' argument is that the issue in *Moorehead,* the defectiveness of the Pitot system, is identical to the issue here since both planes had the same Pitot system. This characterization of the issue is overly broad. *Moorehead* involved a plane which crashed both because of pilot negligence and because of the faulty Pitot tube. The pilot in Moorehead had negligently entered an ice producing cloud at an altitude of 21,000 feet. Once in the cloud the plane began to decelerate drastically because of ice accumulation on the wings. The court found that the Pitot valve had frozen "just prior to the time the plane leveled off at flight level [21,000 feet]," so that the air speed indicator did not show the plane's deceleration. 639 F.Supp. at 400. As a result, the pilot erroneously believed he could climb to an altitude of 23,000 feet leading to a fatal stall and spin of the craft. The court concluded that "inadequate heating and poor location of the pressure tube rendered the Pitot system defective ... [and] the plane unreasonably dangerous." 639 F.Supp. at 401. The *Moorehead* finding of defectiveness was thus clearly predicated on the fact that the Pitot System had frozen at an altitude of 21,000 feet in a moderately heavy icing environment.[21]

**20.** Minnesota has the identical four requirements. *See, e.g., Kaiser v. Northern States Power Co.,* 353 N.W.2d 899, 902 (Minn.1984).

**21.** Plaintiffs contend that the issue of whether the Pitot-tube froze relates to causation and is analytically distinct from the issue of product defect. But the *Moorehead* court found the product defective because "[o]nly minor changes would have alleviated most of the risk flowing from inaccurate air speed indications." 639 F.Supp. at 401. The inaccurate air speed indications were the result of the Pitot-tube freezing, however. Accordingly, the issue of defect is not completely separable from the issue of whether the tube froze.

Defendants present convincing arguments why at the very least, material issues of fact exist on whether the circumstances in the case at bar are factually distinct from those involved in the *Moorehead* decision. The Pitot system in *Moorehead* froze at a level of 21,000 feet in a moderate icing levels.[22] 639 F.Supp. at 396, 398. In the case at bar, however, the relevant air conditions and altitude were quite different. Here, the plane crashed while making its final approach to Crystal airport from an altitude of 2,900 feet. The icing conditions the plane encountered were trace to light, as opposed to the moderate levels in the *Moorehead* case. *See* Exhibits B to Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Partial Summary Judgment (Defendants' Memorandum), Deposition of Richard Kemper[23] at 135; and Climatological Consulting Report (Report). In addition, defendants have included deposition testimony of three experts who are of the opinion that the Pitot tube in the case at bar did not freeze[24]. Exhibit A to Defendants' Memorandum, Depositions of Richard Kemper, Kenneth Yeoman and Eric Daiber. Because the factual predicates underpinning the *Moorehead* holding are not clearly established in the case at bar, collateral estoppel is inappropriate. *See United States v. Stauffer Chemical Co.*, 464 U.S. 165, 172, 104 S.Ct. 575, 579, 78 L.Ed.2d 388 (1984) (applying collateral estoppel in part because "[a]ny factual differences between the two cases ... are of no legal significance whatever in resolving the issue presented in both cases"); *Rufenacht v. Iowa Beef Processors Inc.*, 656 F.2d 198, 203 (5th Cir. 1981) (where claims of agency status related to different transactions, fact that transactions were similar in nature and close in time did not mean they were identical for collateral estoppel purposes), *cert. denied*, 455 U.S. 921, 102 S.Ct. 1279, 71 L.Ed.2d 462 (1982); *Williams v. Laurence-David, Inc.*, 271 Or. 712, 534 P.2d 173 (1975) (same); *cf. Hale v. Firestone Tire & Rubber Co.*, 756 F.2d 1322, 1332 (8th Cir.1985) (admissibility of other accidents in products liability case hinged on whether the other accidents occurred in "substantially similar circumstances").

## C. Full and Fair Opportunity to Litigate

The doctrine of collateral estoppel rests on the premise that a party who has lost after having had a full and fair opportunity to litigate an issue should not be entitled to a second opportunity to relitigate it. *Blonder–Tongue*, 402 U.S. at 328–29, 91 S.Ct. at 1442–43. In *Parklane*, the Supreme Court noted that unfairness to the defendant was one of the major considerations in determining whether or not to apply collateral estoppel 439 U.S. at 330, 99 S.Ct. at 651. The Court listed a number of examples in which unfairness would result from the application of collateral estoppel:

> If a defendant in the first action is sued for small or nominal damages, he may have little incentive to defend vigorously, particularly if future suits are not foreseeable..... Still another situation where it might be unfair to apply offensive collateral estoppel is where the second action affords the defendant procedural opportunities unavailable in the first action that could readily cause a different result.

439 U.S. at 330–31, 99 S.Ct. at 651. (Citations and footnote omitted.)

In *Moorehead*, the plane was well above the freezing level and the temperatures were subfreezing. 639 F.Supp. at 395. The temperature in the clouds around Crystal Airport ranged from minus one to minus four degrees centigrade. Exhibit B to Defendants' Memorandum, Climatological Report. Although the *Moorehead* court did not state what the temperature at 21,000 feet was, the implication of the opinion is that it was substantially below freezing.

---

**22.** The *Moorehead* court noted "[t]here are four levels of icing intensity: trace, light, moderate and severe. If the ice accumulation is moderate, even short encounters can be hazardous and the use of deicing equipment or course diversion is necessary." 639 F.Supp. at 393 n. 3 The icing conditions in *Moorehead* were at the moderate level.

**23.** Kemper is an expert witness for defendants.

**24.** An additional relevant difference may be the temperatures in *Moorehead* and the case at bar.

In this case two "unfairness" factors militate against the application of collateral estoppel. First, in the *Moorehead* case, Mitsubishi Aircraft International had settled with the plaintiffs prior to trial and remained a defendant solely to determine its right to contribution or setoff of the remaining defendants. 639 F.Supp. at 389. Thus at the time of trial Aircraft International faced no additional damage exposure. This factor militates against the application of collateral estoppel in this case. *See Otherson v. Department of Justice, I.N.S.,* 711 F.2d 267, 273 (D.C.Cir.1983) (lack of incentive to litigate can occur even if some litigation in first trial actually occurred).

In addition to lack of incentive, defendants claim the actual trial in *Moorehead* did not provide Mitsubishi with a full and fair opportunity to contest the defectiveness of the Pitot-static system. The *Moorehead* trial was limited to five days during which time defendants presented only very limited expert testimony on the Pitot system. In contrast, considerable discovery about the Pitot system has been taken by both parties in the case at bar. While defendants do not allege that the expert evidence accumulated in this case could not also have been obtained for the *Moorehead* litigation, there is no doubt that the evidence on this issue is of greater importance in this case since their liability, if any, has not yet been determined. Accordingly, the Court finds the issue should be fully litigated here. *See, e.g., Blonder–Tongue,* 402 U.S. at 333, 91 S.Ct. at 1445 (full and fair opportunity is not present where party through no fault of own was "deprived of crucial evidence or witnesses in the first litigation"); *Selectron Inc. v. American Tel. & Tel. Co.,* 587 F.Supp. 856 (D.Or.1984) (claim of newly discovered evidence insufficient to preclude collateral estoppel where not only could evidence have been obtained in prior trial but, most importantly, the evidence was not crucial). It is clear that the defectiveness issue was not fully litigated in *Moorehead* and defendants should be given the chance to do so here.

### D. Judicial Economy

Plaintiffs in this case are seeking to collaterally estop defendants from denying that the Pitot system at issue was defective and unreasonably dangerous. These are the first two elements of the showing required in Minnesota to maintain a successful products liability action. Minnesota adheres to the standards established in the Restatement (Second) of Torts, § 402A (1965) with regards to products liability suits. In Minnesota, plaintiffs must show:

> (1) That the product was purchased in a defective condition unreasonably dangerous for its use;
>
> (2) That such defective condition existed when the product first left the hands of the defendant;
>
> (3) That the defect was the proximate cause of the injury suffered.

*O'Laughlin v. Minnesota Natural Gas. Co.,* 253 N.W.2d 826 (Minn.1977). The Texas [25] requirements are virtually identical. *See Syrie v. Knoll International,* 748 F.2d 304, 306 (5th Cir.1984) (applying Texas law). Plaintiffs in this case are only moving for a ruling on the first two elements of their products liability case. Accordingly, they would still have to prove the defective and unreasonably dangerous Pitot system caused the crash. To prove this, however, it will be necessary to show that the Pitot system froze. Accordingly, applying collateral estoppel will not result in significant judicial economy. *See Aloe Coal Co. v. Clark Equipment Co.,* 623 F.Supp. 88, 89 (W.D.Pa.1985) (prior finding of product defect would not be given collateral estoppel effect because no judicial economy would result since testimony regarding defect would still be necessary to prove causation), *rev'd on other grounds,* 816 F.2d

---

**25.** An issue exists as to which state's product liability law governs this action. The crash occurred in Minnesota, but the plane was manufactured in Texas. The Court must apply Minnesota's conflict of law rules to resolve the issue. Since resolution of this issue does not make a difference as to the outcome of the motion, and since the parties have not briefed this issue, it is not necessary that the Court resolve it at the present time. For the purposes of this motion only the Court will apply Minnesota law.

110, 111 (3d Cir.1987); *Miller v. Johns-Manville Sales Corp.*, 538 F.Supp. 631, 634 (D.Kan.1982) (no collateral estoppel effect given to earlier finding that asbestos was unreasonably dangerous and defective because state law comparative fault principles still required plaintiffs to present all evidence of defendant's fault). In sum, nothing would be gained by preventing defendants from litigating the defectiveness of the Pitot-system.

## II. Motion to Preclude

During the course of discovery in this matter a dispute arose concerning plaintiffs' request for information regarding the MU–2 line of airplanes manufactured by Mitsubishi. In their interrogatories and requests for production of documents plaintiffs sought information concerning the "entire series of MU–2 aircraft." Mitsubishi objected to these discovery requests on the ground that they were overly broad. Plaintiffs brought a motion to compel, which was heard by the Magistrate. After hearing arguments of respective counsel, by order dated November 14, 1985 the Magistrate limited discovery to information concerning the MU–2B–40 and MU–2B–26A models.

On September 7, 1984 the Federal Aviation Administration (FAA) issued a document entitled "Mitsubishi MU–2 Special Certification Review, Final Report" (FAA report). This report was the final product of an investigation into planes manufactured by Mitsubishi. Plaintiffs now bring this motion to preclude the admission of the FAA report, on the basis that it is irrelevant and exceeds the scope of discovery in the case.

### A. Relevancy and Judicial Estoppel

 Plaintiffs move to preclude introduction of the FAA report on two grounds: the general irrelevancy of the report under Fed.R.Evid. 401, or alternatively, principles of estoppel. Rule 401 provides that:

"Relevant evidence" means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

Fed.R.Evid. 401. Rule 402 provides:

All relevant evidence is admissible, except as otherwise provided by the Constitution of the United States, by Act of Congress, by these rules, or by other rules prescribed by the Supreme Court pursuant to statutory authority. Evidence which is not relevant is not admissible.

Fed.R.Evid. 402. Under the rules, evidence is relevant if it has the tendency to make the existence of a consequential fact more or less probable than it would be without the evidence. In general, where evidence of other accidents involving a product is concerned, a party seeking to introduce evidence must show that the other accidents occurred under "substantially similar circumstances" and involved "substantially similar" components or products. *Independent School District v. Celotex*, 309 Minn. 310, 244 N.W.2d 264, 266 (1976); *Brooks v. Chrysler Corp.*, 786 F.2d 1191, 1195 (D.C.Cir.), *cert. denied,* —— U.S. ——, 107 S.Ct. 185, 93 L.Ed.2d 119 (1986); *Jackson v. Firestone Tire and Rubber Co.*, 788 F.2d 1070, 1082 (5th Cir.1986); *Hale v. Firestone Tire and Rubber Co.*, 756 F.2d 1322, 1332 (8th Cir.1985).

Plaintiffs argue that the FAA report is irrelevant because it was based upon evaluations and conclusions concerning models of the MU–2 aircraft which are significantly different than the MU–2B–40 or MU–2B–26A models. Neither the MU–2B–40 nor MU–2B–26A models were used in evaluation flights conducted by the FAA. During the course of a dispute regarding the breadth of permissible discovery defendants acknowledged that "[t]he MU–2B–40 model aircraft is an aircraft that differs significantly from all other models of the MU–2 aircraft except for the MU–2B–26A model." Plaintiffs' Exh. A in Support of Motion in Limine at 12. Because the MU–2B–40 and MU–2B–26A models were not used in the FAA's evaluation flights, and because defendants have admitted that the MU–2B–40 and MU–2B–26A models are significantly different from the models which were used in the evaluation flights,

the FAA report is simply not relevant under rules 401 and 402 of the Federal Rules of Evidence, plaintiffs argue.

Defendants contend that the statements made by their counsel to the Magistrate notwithstanding, they have produced materials relevant to the entire line of Mitsubishi airplanes throughout this litigation. In fact, defendants contend that the vast majority of documents produced by them pertain to models of MU–2 aircraft other than the –40 and –26A models. Defendants do not deny that the FAA evaluation was based on flights involving planes other than than the –40 and –26A, but contend reevaluation applies to all species of Mitsubishi aircraft, since the FAA evaluated both the Mitsubishi long and short body type airplanes.

■ The Court concludes that the FAA report meets the broad test of relevance set forth in rules 401 and 402 and accordingly plaintiffs' motion will be denied. Plaintiffs have pointed out a number of grounds on which they might effectively impeach the report. But plaintiffs have not established that the report is not relevant. The jury will not be denied the opportunity to consider the report along with all other evidence in the case.

■ In the alternative, plaintiffs contend that defendants are precluded from introducing the report by principles of "judicial estoppel." In general, judicial estoppel precludes a party from asserting a position in a legal proceeding which is inconsistent with a position taken by that party in the same or a related proceeding. *Allen v. Zurich Insurance Co.*, 667 F.2d 1162, 1166 (4th Cir.1982); *USLIFE Corp. v. U.S. Life Ins. Co.*, 560 F.Supp. 1302, 1304 (N.D. Tex.1983). At base the doctrine is designed to "protect the integrity of the judicial process." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir.1982).

Here, plaintiffs contend that defendants are judicially estopped from denying that the FAA report is irrelevant. This argument is based on plaintiffs' claim that defendants admitted the irrelevancy of the report in the course of arguments made to the Magistrate in November 1985. Plaintiffs contend that they relied on defendants' claims in narrowing their discovery requests to the –40 and –26A models, and claim that they would be greatly prejudiced were they now required to rebut the FAA report.

In response, defendants point out that the Magistrate's November 1985 order notwithstanding, they produced a significant quantum of documentation relative to the entire line of MU–2 aircraft. Additionally, defendants have produced all documents in their files relating to the FAA's special certification review of the MU–2 line, including all documents pertaining to the icing flight tests conducted by the FAA.

■ Plaintiffs' judicial estoppel arguments will be rejected. Plaintiffs have discovered information from defendants concerning MU–2 aircraft, including the –40 and –26A models, and their handling under icing conditions. Based on discovery to date, plaintiffs are adequately equipped to impeach the FAA report, and denial of their motion will not unduly prejudice them. Plaintiffs' motion to preclude admissibility of the FAA report will be denied.

**B. Default Judgment**

Plaintiffs have also brought a motion for default judgment based on alleged "fraud on the court" committed by defendants. Plaintiffs contend that defendants committed fraud on the Court by representing to the Magistrate that the –40 and –26A models are completely dissimilar from other MU–2 models, only to later represent to the Court, in connection with these motions, that the –40 and –26A are in fact similar to other MU–2 aircraft. Plaintiffs claim that defendants deprived them of the opportunity to take meaningful discovery by the fraud perpetrated on the Magistrate. Plaintiffs also move to preclude the testimony of defendants' experts relating to MU–2 models other than the –40 and –26A.

In general, fraud on the Court occurs where "the impartial functions of the court have been directly corrupted." *Matter of Whitney-Forbes, Inc.*, 770 F.2d 692, 698 (7th Cir.1985). To constitute fraud on the

Court the fraudulent act must be "directed to the judicial machinery itself." *Bulloch v. United States*, 721 F.2d 713, 718 (10th Cir.1983).

▇▇ Plaintiffs' motion for default judgment and to preclude expert testimony will be denied. Defendants' counsel made statements which are arguably inconsistent, but this alone does not rise to the level of fraud on the Court. Plaintiffs have had ample opportunity to discover relevant documents and will not be unduly prejudiced by admission of the FAA report, particularly in view of the fact they can impeach the report by pointing out to the jury that it was based on evaluation flights of planes other than the –40 and –26A models. The jury will be permitted to consider this evidence along with all other evidence in the case and to give it what weight they think it deserves.

### III. Pilot Negligence

In their answer to plaintiffs' complaint defendants asserted in their ninth and tenth affirmative defenses that the crash was caused by plaintiffs' negligence, in particular that of Paul Held, Sr., Paul Held, Jr. and John T. White. At the time of the crash the occupants of the cabin were Held, Sr. and Held, Jr. Held, Sr. and Held, Jr. were licensed pilots. The plane had a complete set of dual controls which enabled either occupant of the two front seats to fly the craft. It has been determined that at the time of the crash, Held, Sr. was sitting in the left front seat and Held, Jr. in the right front seat. Held, Sr. held a multi-engine pilot's license with an instrument rating. However, Held, Sr.'s instrument rating was not current at the time of the accident due to his failure to execute the minimum number of required instrument approaches in the six months preceding the accident. Held, Jr. was undergoing instrument training at the time period of the accident. It is not known which of the Helds was operating the craft at the time of the accident.

In their ninth and tenth affirmative defenses, defendants claim the accident was caused by pilot negligence. Plaintiffs now bring this motion to preclude these defenses as to Held, Jr. and White. The Court will grant plaintiffs' motion as regards White as defendants have withdrawn their claim of negligence in his case. The Court will, however, deny plaintiffs' motion as regards Held, Jr.

The sole case cited by plaintiffs in support of their motion is *Lange v. Nelson–Ryan Flight Service, Inc.*, 259 Minn. 460, 108 N.W.2d 428 (1961). In *Lange* a plane crash occurred in which both passengers, a commercial pilot with an instrument rating and a flight instructor, were killed. Plaintiffs claimed the accident was caused by the flight instructor's negligence while the defendants claimed the cause of the accident was the negligence of the pilot (plaintiff's decedent). The Minnesota Supreme Court held that the flight instructor was legally responsible for the flight and that the trainee was a mere passenger and could not be found to be negligent. Because there was no evidence before the jury from which it could infer which of the two men was controlling the plane, the Court was constrained to find as a matter of law that the instructor was operating the plane and that the pilot (plaintiff's decedent) was not negligent.

Defendants argue convincingly that *Lange* is distinguishable, for several reasons.

First, although in *Lange* there was "no evidence" regarding which of the two men was operating the plane, here there is at least some evidence that it was Held, Jr. who was in charge of the craft when it crashed. Held, Sr. was familiar with the Fargo airport from which the plane departed. However, in lining up for take-off on the Fargo runway, the plane lined up in the middle, rather than at the end of the runway, which would have resulted in a crash at take-off (due to insufficient distance to work up flying speed) had the error not been corrected by the Fargo controllers. The fact that Held, Sr. was familiar with the airport but that the plane lined up incorrectly indicates inferentially that Held, Jr. was at the controls, defendants contend. Because here there is some evidence as to

which of the two men was at the controls, the question should go to the jury and *Lange* is inapposite, defendants reason.

 More significantly, no matter which of the two men piloted the craft, defendants' claim of negligence may be pursued. Held, Sr. was instrument rated but was not current in his rating, and Held, Jr. was not instrument rated. Defendants may permissibly argue that the flight path of the craft was equally indicative of the acts of a multi-engine pilot who had allowed his instrument skills to decay, such as Held, Sr., as it was with the acts of a private single-engine pilot who was undergoing training for his instrument rating, as with Held, Jr. Thus, even if it is accepted that Held, Sr. was the man in charge of the craft, defendants will still be able to raise a pilot negligence defense.

Based on the foregoing, and upon all files, records and proceedings herein,

IT IS ORDERED that:

(1) defendant Heavy Industries' motion for summary judgment as to United's causes of action in negligence and breach of implied warranty of merchantability is denied;

(2) defendant Heavy Industries' motion as to United's causes of action in strict liability in tort is granted;

(3) defendant Aircraft International's motion for summary judgment as to plaintiffs' causes of action for negligence and breach of the warranties contained in the contract is denied;

(4) defendant Aircraft International's motion as to plaintiffs' cause of action in strict liability in tort, breach of implied warranties, and breach of express warranties beyond those in the contract is granted;

(5) defendants' motion for summary judgment as to plaintiffs' tail flow separation theory is denied;

(6) plaintiffs' motion for application of collateral estoppel is denied;

(7) plaintiffs' motion to preclude admission of the FAA certification report is denied;

(8) plaintiffs' motion for default judgment is denied; and

(9) plaintiffs' motion to strike defendants' ninth and tenth affirmative defenses is denied as to Paul Robert Held, Jr. but granted as to John T. White.